UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN W. PATON,

    *Plaintiff*,

*v*.                                CASE NO. 11-CV-15514

COMMISSIONER OF             DISTRICT JUDGE BERNARD A. FRIEDMAN
SOCIAL SECURITY,              MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

### II.  REPORT

#### A.  Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability and Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 8, 11.)

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Plaintiff John W. Paton[2] was 24 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 5 at 36.) Plaintiff's employment history from 2003 through 2008 includes work at various fast food restaurants and retail jobs for very short periods of time. (Tr. at 282.) Plaintiff filed the instant claims on October 6, 2009, alleging that he became unable to work on January 1, 2009. (Tr. at 197, 202.) The claims were denied at the initial administrative stages. (Tr. at 84-85.) In denying Plaintiff's claims, the Commissioner considered affective disorders and personality disorders as possible bases for disability. (*Id.*) On November 3, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") David N. Herstam, who considered the application for benefits *de novo*. (Tr. at 16-26; 31-83.) In a decision dated January 10, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 26.) Plaintiff requested a review of this decision on February 22, 2011. (Tr. at 14-15.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on October 17, 2011, when, after review of additional exhibits[3] (Tr. at 284-89), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On December 16, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.     Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the

---

[2]I note that at times in the record Plaintiff's last name is spelled with two "t"s and at times it is John W. Paton III.

[3]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely

3

because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

**C.    Governing Law**

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken

4

adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden

5

transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through September 30, 2009, and that Plaintiff had not engaged in substantial gainful activity since January 1, 2009, the alleged onset date. (Tr. at 21.) At step two, the ALJ found that Plaintiff's depression, mixed personality disorder and intermittent ongoing substance abuse were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 21-22.) At step four, the ALJ found that Plaintiff could not perform any of his past relevant work. (Tr. at 25.) The ALJ also found that on the alleged disability onset date Plaintiff was a younger individual, i.e., between the ages of 18 and 49. (*Id.*) At step five, the ALJ found that Plaintiff could perform a limited range of medium unskilled work with the nonexertional limitation of no more than incidental contact with coworkers, supervisors, and the general public. (Tr. at 22-24.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 26.)

### E. Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that on June 24, 2003, Plaintiff was sent for a psychiatric evaluation following an incident with police where, upon being given a citation for operating a vehicle without a license, Plaintiff became upset and told the police that he was suicidal and needed help. (Tr. at 291.) Once at the psychiatric evaluation, it was noted that Plaintiff "began to have, what he calls, an anxiety attack . . . because he knows that driving without a license will result in his being unable to obtain a license until he is 21." (Tr. at 293.) It was also noted that Plaintiff "denies feeling suicidal at this

6

time, and simply wants to be discharged to home." (Tr. at 291.) It was also noted that Plaintiff had been hospitalized at "Havenwyck 6 weeks ago after having become involved in a verbal altercation with his mother. He was discharged after 4 days on Celexa . . . . He has subsequently seen Wendy Thompson on 3 occasions but has not yet seen the psychiatrist." (Tr. at 291, 293.)[4] The records indicate that the content of his speech was "remarkable for some grandiosity in terms of his intellectual prowess and artistic ability." (Tr. at 291.) Plaintiff was found to be "oriented times 3" and his "[j]udgement and insight were fair." (Tr. at 292.) Based on his mother's concerns for his safety, Plaintiff was admitted for "further evaluation, medication evaluation, and safety." (*Id.*) Plaintiff also indicated that he was "getting along with the therapist, whose name is Wendy Thompson, well and that he wishes to continue his therapy. However, he did not like the side effects of Celexa, which he reported as being to decrease his I.Q. . . . [so he] discontinued taking the Celexa two days ago." (Tr. at 293.) At the time Plaintiff's discharge on July 1, 2003, he was diagnosed with bipolar affective disorder type 1 and a assessed GAF score of 65. (Tr. at 298.)

On September 1, 2009, Plaintiff was treated by Scott Mial, M.D., for complaints of pain in his knees, feet, and hips. (Tr. at 325, 437.) Dr. Mial diagnosed a plantar wart on his left foot, tobacco addiction, and drew blood to test for any arthritic conditions. (*Id.*)

On September 30, 2009, Plaintiff was examined by Marc Strickler, M.D., who diagnosed "[h]abitual gait disorder" and suggested "nurse shoes" and "several stretches ." (Tr. at 453.)

On December 7, 2009, Plaintiff was referred to Nick Boneff, Ph.D., of the Disability Determination Services ("DDS") for an evaluation. (Tr. at 331-35.) Dr. Boneff diagnosed bipolar affective disorder (mixed type), cannabis abuse (in current remission), and mixed personality disorder with narcissistic, antisocial, and dependent features; he also assessed a GAF score of 47 and gave a "guarded" prognosis. (Tr. at 334-35.) Dr. Boneff concluded:

> Based on today's exam, the claimant presented as an intelligent man with a number of cognitive strengths . . . in terms of immediate and short-term memory and the ability to concentrate and pay attention, as well as the capacity for abstract thinking and awareness of social norms and conventions. He clearly has the cognitive capacities to be able to engage successfully in any number of work-type activities,

---

[4]Havenwyck records are also included in the medical record. (Tr. at 466-535.)

but appears to have severe characterological problems that seem to make him feel that he should not have to tolerate any frustration, and thus these difficulties get in the way of successful engagement in work-type activities. However, he clearly has the cognitive capacities to engage successfully in work-type activities to high degree of complexity.

(Tr. at 335.)

A Psychiatric Review Technique completed on December 19, 2009, by Rose Moten-Solomon, M.D., concluded that there was insufficient evidence. (Tr. at 351.) However, the following day Dr. Moten-Solomon diagnosed Plaintiff with affective disorders (bipolar affective disorder, mixed type), personality disorders (mixed personality disorder), and substance addiction disorders. (Tr. at 369, 372, 376.) Plaintiff was found to be moderately limited in maintaining social functioning and maintaining concentration, persistence, or pace, and mildly limited in activities of daily living. (Tr. at 379.) Plaintiff was found to be "partially credible" and it was noted that he was not receiving treatment for his psychiatric condition at that time. (Tr. at 381.)

A Mental RFC Assessment completed on December 20, 2009, by Dr. Moten-Solomon concluded that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to maintain attention and concentration for extended periods but was otherwise not significantly limited in understanding, memory, or sustained concentration and persistence. (Tr. at 365-66.) Plaintiff was found to be moderately limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes but was otherwise not significantly limited in social interaction or adaptation. (Tr. at 366.) The rationale for the findings indicated that

> [t]he evidence in file supports the clmt's allegations. However, the evidence does not support a MDI [Medically Determinable Impairment] that would significantly limit the clmt's ability to engage in simple work activity. The clmt is not involved in any outpt treatment. He does however have a history of psych treatment as a teen. At the CE [Consultative Examination], the clmt demonstrates an intact MSE and a number of cognitive strengths in terms of immediate and STM [Short Term Memory] and the capacity to concentrate an[d] pay attention. ADLs [Activities of Daily Living] do not reveal significant mental limitations. The totality of the evidence supports the clmt's ability to engage in simple to moderate work activity.

(Tr. at 367.)

8

Plaintiff underwent physical therapy at St. Joseph Mercy Health System from September 2009 through May 2010. (Tr. at 401-65.) On February 24, 2010, it was noted that Plaintiff's gait on a level surface, gait during change in speed, gait with vertical head turn, gait with pivot turn, ability to step over obstacles, ability to step around obstacles, and ability to use stairs or steps were all normal. (Tr. at 416-18.) The only abnormal notation was a mild impairment of gait with horizontal head turns. (Tr. at 416.)

On March 16, 2010, Dr. Mial wrote Plaintiff a prescription for "nursing shoes" and noted that although Plaintiff "again asked for pain medicine[,] I again did not give him any." (Tr. at 547.) Dr. Mial also noted that Plaintiff was "requesting Disability papers to be filled out. I am uncertain as to what the thought is behind this secondary to his young age and current state of health." (Tr. at 434, 547.)

On May 27, 2010, Dr. Strickler indicated that Plaintiff had acquired custom shoes and the doctor noted "significant improvement in his pain," "markedly improved" gait, that Plaintiff was "no longer toe walking" and that he "has a more normal gait now." (Tr. at 567.) Dr. Strickler noted, "I am not really sure he will qualify for disability, however, I told him that I would fill out the forms for him if he desires." (*Id.*)

On June 18, 2010, x-rays of Plaintiff's lumbar spine and pelvis were normal. (Tr. at 561-62.)

On June 21, 2010, Plaintiff underwent a psychiatric evaluation at the Washtenaw Community Health Organization. (Tr. at 576-81.) Plaintiff indicated that he came to the organization because he needed "more supportive mental health treatment than I was getting from the other place and also I'm filing for social security disability and they told me it would be good to be seen somewhere for my bipolar." (Tr. at 576.) Plaintiff was diagnosed with cannabis abuse, nicotine related disorder, and narcissistic personality disorder; he was assessed a GAF score of 49. (Tr. at 582.) Plaintiff continued to be seen and his medication was reviewed. (Tr. at 583-617.)

At the administrative hearing, Plaintiff testified that he is divorced, lives with his parents, and drives himself to school at Washtenaw Community College. (Tr. at 36-37.) Plaintiff indicated

that he was taking thirteen credit hours of general education courses "towards a math and science degree." (Tr. at 37.) Plaintiff stated that classes were going "[f]airly well" and that, "[g]enerally speaking," he has attended classes on a regular basis. (Tr. at 38.) Plaintiff also stated that his current schedule included classes for seven hours on Monday and Wednesday and three hours on Friday. (Tr. at 59.)

Plaintiff testified that he was convicted of possession with intent to deliver marijuana in 2007, which is a felony. (Tr. at 39-40.) Plaintiff also testified that he had been convicted of "[a]ssault, malicious destruction of private property" "on several occasions." (Tr. at 40-41.) Plaintiff stated that his "only form of income" has been when he "donated plasma." (Tr. at 41.) When asked why Plaintiff chose January 2009 for the alleged onset date, Plaintiff responded, "an emotional breakdown"; his counsel explained it was a "miscommunication." (Tr. at 41.) Plaintiff stated that he worked full-time for a telemarketing company in April 2009 but left after one month. (Tr. at 43.) When asked whether he was fired or quit, Plaintiff stated that he quit and, when asked the reason, Plaintiff stated:

> I was sitting at my station, performing my duties, and was overcome by depression and just felt like I couldn't continue. I had difficulty focusing on the tasks that I was given and I didn't believe that I could continue doing the job effectively.

(*Id.*) Plaintiff also quit a full-time job at Sears retail store because of "emotional stress and difficulties in my marriage at the time and we decided that I couldn't handle working at Sears at the time." (Tr. at 45.)

Plaintiff was also employed by Nelson Floor Covering as a carpet installer in 2008 for two to three months. (Tr. at 45-46.) Plaintiff was terminated from that job after an argument "erupted" with his boss that resulted in his boss "call[ing] the police to have [him] escorted off the premises[.]" (Tr. at 46.)

Plaintiff stated that his disability is based on his "bipolar type I disorder," for which he began receiving treatment in the fall of 2009 with Dr. Washington, as well as his "Plantar's fasciitis on both feet," which was diagnosed by Dr. Marc Stickler in early 2009. (Tr. at 47, 50.) Plaintiff indicated that Dr. Washington prescribed Zyprexa, but that Plaintiff felt it did not help

10

and that the side effects caused him to feel "tired and fatigued." (Tr. at 54-55.) Plaintiff was then placed on Invega, then Abilify, and finally Abilify and Zoloft. (Tr. at 54-55.) As to current side effects, Plaintiff indicated that the "Zoloft has caused me to lose my train of thought" and that he was "having difficulty with recall and memory retrieval and I had impotency." (Tr. at 55.)

As to symptoms of his mental health issues, Plaintiff indicated he has "[e]xtreme bouts of rage, frustration, uncontrollable crying, irregular thought patters, low self-esteem, [and] continuous depression"; when asked what causes him to lose his temper, Plaintiff responded, "[j]ust about anything: the comments that someone might make, traffic, something that's said on TV, commercials, a dog barking, phones ringing." (Tr. at 55.) Plaintiff stated that the way he exhibits such rage is, "I scream; I verbally assault people; destroy property; hurt myself." (*Id.*) Plaintiff explained that he recently "smashed [a VCR] into pieces, banging his fist thought it," that he has "destroyed speakers by slamming them repeatedly against [his] desk," and that he "ripped off the sideview mirror of a car." (Tr. at 56.) Plaintiff noted that "[a]s early as third grade I was - - I had thrown a desk at another student and was known for being extremely aggressive." (*Id.*) Plaintiff further testified that he cries every day when "[t]hinking about my life, the past, being impoverished, losing my wife, who's now my ex-wife, having a difficult home setting . . . ." (Tr. at 56.) Plaintiff stated that although he thinks about suicide "daily" he has never attempted suicide. (Tr. at 57.)

Plaintiff testified that he helps around the house by doing dishes. (Tr. at 59.) He stated that he enjoys reading, listening to music and playing the guitar. (Tr. at 60.) Plaintiff also stated that he is able to take care of his personal needs, reach, and lift fifteen pounds, but could only stand for ten to fifteen minutes because of his Plantar's fasciitis, which is a constant, aching pain that is aggravated by standing or walking. (Tr. at 61-62.) Plaintiff also indicated that he can sit for an hour before he needs to get up and stretch and that he has "very poor balance due to the Plantar's fasciitis." (Tr. at 65.) Plaintiff testified that he drank approximately one fifth of liquor per night from age fourteen until he reached age twenty-one, at which time he stopped because of the "realization of the physical effect, wanting to make a better life." (Tr. at 69.) Plaintiff began using

marijuana at age seventeen and stated that he had used marijuana as recently as the month prior to the hearing. (Tr. at 69-70.) Plaintiff also indicated that he has been homeless at the ages of 16, 18, 19, 21, and 23 because of "[e]xplosive situations with those which I was staying with." (Tr. at 71.)

Medical expert Alvin Smith, M.D., testified and summarized the medical records. (Tr. at 65-68.) Dr. Smith opined that Plaintiff did not meet any of the Listings because he "didn't think his condition clinically or functionally reached the level required for meeting or equaling a listed impairment." (Tr. at 72.) Dr. Smith testified that "his condition would lead to primarily issues in the social arena, so I would limit him to no more than incidental contact with the public, co-workers and supervisors." (Tr. at 73.)

At the administrative hearing, the ALJ asked the Vocational Expert ("VE") to consider an individual with Plaintiff's background who:

> in the lift category, 25 to 50 pounds; standing six hours of an eight-hour day; sitting six hours of an eight-hour day; no ropes, ladders or scaffolds; no balancing; no working at heights; only incidental contact with co-workers, supervisors and the public.

(Tr. at 74-75.) The VE responded that although such a person could not perform Plaintiff's past work as a pizza delivery person, such a person could perform the medium work of a package handler (9,508 jobs in Michigan), box bender (1,259 jobs in Michigan), and tile setter (615 jobs in Michigan). (Tr. at 76.)

### F. Analysis and Conclusions

#### 1. Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the residual functional capacity to perform a limited rnage of medium work with some nonexertional limitations. (Tr. at 22-24.) "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. 404.1567(c).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2. Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 8.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ erred by including limitations based on Plaintiff's bilateral foot problems in the RFC analysis when he did not find that Plaintiff's bilateral foot problems were a severe impairment. (Doc. 8 at 10-12.) In addition, Plaintiff contends that the ALJ's RFC analysis was flawed because the ALJ incorporated erroneous diagnoses (Doc. 8 at 12-14), did not properly consider Plaintiff's treatment history (Doc. 8 at 14-16), and improperly relied solely on the findings of the non-examining medical consultant who testified at the hearing. (Doc. 8 at 16-19.)

### a. Severe Impairments

Plaintiff contends that the ALJ erred by including limitations based on Plaintiff's bilateral foot problems in the RFC analysis when he did not find that Plaintiff's bilateral foot problems were a severe impairment. (Doc. 8 at 10-12.) In the Sixth Circuit, "the severity determination is 'a *de minimis* hurdle in the disability determination process.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Higgs*, 880 F.2d at 862. The test is used to "screen out totally groundless claims." *Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).

In the instant case, the ALJ did not find Plaintiff's bilateral foot problems to be severe impairments but did include those problems when considering Plaintiff's functional capacity. (Tr. at 22.) The ALJ committed no error. Under the applicable regulations, the RFC determination must account for limitations imposed by both severe and nonsevere impairments. 20 C.F.R. § 404.1545(a)(2). As a corollary to this rule, the ALJ should adequately explain his evaluation of the effects of the nonsevere impairments. 42 U.S.C. § 423(d)(2)(b). In the instant case, I suggest that the ALJ did exactly as required by the regulations.

To the extent Plaintiff argues that his bilateral foot problems should have been considered severe, this argument fails because once step two is "cleared" by a finding that some severe impairment exists, then the ALJ must consider a plaintiff's "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony*, 266 F. App'x at 457. "The fact that some of [Plaintiff's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Id.* Consequently, I suggest that any alleged omission from the list of severe impairments does not undermine the ALJ's decision.

**b.     RFC Analysis**

Plaintiff contends that the ALJ's RFC analysis was flawed because the ALJ incorporated erroneous diagnoses (Doc. 8 at 12-14), did not properly consider Plaintiff's treatment history (Doc. 8 at 14-16), and improperly relied solely on the findings of the non-examining medical consultant who testified at the hearing. (Doc. 8 at 16-19.)

First, the ALJ considered all the medical opinions, not just the opinion of the medical expert who testified at the hearing. (Tr. at 21-24.) Second, as to erroneous diagnoses, Plaintiff contends that the severe impairments listed by the ALJ, i.e., depression, mixed personality disorder, and intermittent ongoing substance abuse, "do not correspond to those rendered by any of the psychiatric/psychological experts[.]" (Doc. 8 at 12.) However, a review of the record indicates that Plaintiff was diagnosed with "mixed personality disorder" and "cannabis abuse, in current remission" by Dr. Boneff. (Tr. at 334-35.) In addition, Dr. Boneff diagnosed "bipolar affective disorder," which contains manic and depressive components. (*Id.*) In addition, the Washtenaw

14

Community Health physician also diagnosed "cannabis abuse, nicotine related disorder, and narcissistic personality disorder[.]" (Tr. at 582.) Finally, Dr. Moten-Solomon diagnosed Plaintiff with affective disorders (bipolar affective disorder, mixed type), personality disorders (mixed personality disorder), and substance addiction disorders. (Tr. at 369, 372, 376.) Therefore, I suggest that the ALJ's listing of severe impairments does not diverge from the record evidence and does not undermine the ALJ's decision.

I further suggest that the ALJ's RFC analysis is fully supported by the record evidence and the opinions of the treating, examining, and non-examining physicians. Plaintiff was found to be "oriented times 3" and his "[j]udgement and insight were fair." (Tr. at 292.) Plaintiff was described as "an intelligent man with a number of cognitive strengths . . . [who] clearly has the cognitive capacities to be able to engage successfully in any number of work-type activities . . . ." (Tr. at 335.) In addition, it was noted that "the evidence does not support a MDI that would significantly limit the [claimant's] ability to engage in simple work activity" and that the "totality of the evidence supports the [claimant's] ability to engage in simple to moderate work activity." (Tr. at 367.) Plaintiff's treating physicians also expressed doubt regarding Plaintiff's disability. Dr. Mial stated that he was "uncertain as to what the thought is behind" Plaintiff requesting disability forms to be completed. (Tr. at 434, 547.) In addition, Dr. Strickler stated, "I am not really sure he will qualify for disability, however, I told him that I would fill out the forms for him if he desires." (Tr. at 567.)

Plaintiff's mental health treatment was not regular and it consisted of, at most, prescription drug treatment. Such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007).

Finally, I suggest that the hypothetical posed to the VE properly incorporated the limitations found in the RFC assessment and was in harmony with the objective record medical evidence and Plaintiff's own testimony that he is able to attend college and take thirteen credit hours of classes, help around the house by doing dishes, that he enjoys reading, listening to music and playing the

15

guitar, and that he is able to take care of his own personal needs. (Tr. at 37-38, 59-60.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

### 3. Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

### III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ Charles E Binder
CHARLES E. BINDER
Dated: December 6, 2012                  United States Magistrate Judge

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  December 6, 2012                     By      s/Patricia T. Morris
                                                Law Clerk to Magistrate Judge Binder

17